EXHIBIT 1

**EXHIBIT 1**

EFiled:  Jun 01 2018 11:06AM EDT
Transaction ID 62086634
Case No. 2018-0177-JTL

**IN THE COURT OF CHANCERY IN THE STATE OF DELAWARE**

| | |
|---|---|
| KENNETH RICHE, On Behalf of Himself and All Others Similarly Situated, | C.A. No. 2018-0177-JTL |
| Plaintiff, | |
| v. | CLASS ACTION |
| JAMES C. PAPPAS, JOHN H. WALKER, DOUGLAS J. GLASPEY, PAUL LARKIN, LELAND "ROY" MINK, RANDOLPH J. HILL, and ALI G. HEDAYAT, | PUBLIC VERSION |
| Defendants. | |

**VERIFIED AMENDED CLASS ACTION COMPLAINT**
**(PUBLIC VERSION)**

Plaintiff Kenneth Riche ("Plaintiff"), through undersigned counsel, brings this Amended Complaint on behalf of himself and the holders of the common stock of U.S. Geothermal Inc. ("U.S. Geothermal" or the "Company") against the members of the Board of Directors (as defined herein) of U.S. Geothermal for breaching their fiduciary duties in connection with the acquisition of U.S. Geothermal by Ormat Technologies, Inc. ("Ormat Technologies"), Ormat Nevada Inc. ("Ormat Nevada" and, together with Ormat Technologies, "Ormat"), and OGP Holding Corp. ("Merger Sub") (the "Buyout" or "Merger"). This action seeks damages suffered by Plaintiff and the Class (as defined herein) as a result of

Defendants' wrongdoing.

The allegations of this Complaint are based on Plaintiff's knowledge as to himself, and on information and belief based upon, among other things, the investigation of counsel and publicly available information, as to all other matters.

## SUMMARY OF THE ACTION

1.     This is a stockholder class action brought by Plaintiff on behalf of U.S. Geothermal stockholders against the U.S. Geothermal Board for breaches of fiduciary duty and/or other violations of state law arising out of the sale of U.S. Geothermal to Ormat by means of an unfair process, for an inadequate price, and without full disclosure of all material information.

2.     Up until the Merger, U.S. Geothermal was a leading and (importantly) profitable renewable energy company focused on the development, production, and sale of electricity from geothermal energy. On January 24, 2018, U.S. Geothermal announced that it had entered into a definitive merger agreement (the "Merger Agreement"), pursuant to which Merger Sub would merge with and into U.S. Geothermal, with U.S. Geothermal continuing as the surviving corporation in the Merger. On April 19, 2018, U.S. Geothermal stockholders voted to approve the Buyout, and, on April 24, 2018, the Buyout was consummated and U.S. Geothermal ceased to be a publicly traded company.

3.     In connection with the Buyout, U.S. Geothermal stockholders

received only **<u>$5.45</u>** in cash for each share of U.S. Geothermal common stock that they owned (the "Merger Consideration"). This Merger Consideration and the Buyout as a whole were the result of a conflicted process that demonstrably failed to maximize stockholder value and to protect the interests of U.S. Geothermal's stockholders. More specifically, Defendants engaged in a process that was designed to satisfy the need and/or desire for liquidity of Defendant Pappas, an activist investor and the Company's controlling stockholder, who took a nearly 15% interest in the Company that precipitated the sales process. Plaintiff has uncovered non-public information demonstrating that, ███████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████. As a result, Plaintiff and the other public stockholders received an unfair price in the Buyout.

      4.    ████████████████████████████████████████

████████████████████████████████████████ Instead, in order to convince stockholders to vote in favor of the Buyout, on March 20, 2018, Defendants authorized the filing of a materially incomplete and misleading definitive proxy statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of their fiduciary duties. ████████████████



such that the vote on the Buyout was not fully informed.

5.      For these reasons and as set forth in detail herein, Plaintiff seeks to recover damages resulting from the Defendants' violations of their fiduciary duties.

## PARTIES

**I.      Plaintiff**

6.      Plaintiff is, and at all relevant times was, a continuous stockholder of U.S. Geothermal.

**II.      Defendants**

7.      Defendant James C. Pappas ("Pappas") has served as a director of the Company since October 2016. In addition to his role on this Board, and other boards, Pappas is the founder and principal of the activist hedge fund JCP Investment Management, LLC ("JCP Investment Management"). Through JCP Investment Management, Pappas controls 15% of the Company's outstanding

common stock. Based upon information and belief, ████████████████

████████████████████████, Defendant Pappas had a need and/or desire

to liquidate his holdings in U.S. Geothermal, ████████████████████

████████████████████████████

8.      Defendant John H. Walker ("Walker") has served as a director of U.S
Geothermal and the Chairman of its Board since December 2003.

9.      Defendant Douglas J. Glaspey ("Glaspey") is the co-founder of U.S.
Geothermal and currently serves as the President, Chief Operating Officer, and a
director of the Company. He has served as a director since December 2003.

10.     Defendant Paul Larkin ("Larkin") has served as a director of the
Company since March 2000.

11.     Defendant Leland "Roy" Mink ("Mink") has served as a director of
the Company since November 2006.

12.     Defendant Randolph J. Hill ("Hill") has served as a director of the
Company since September 2016.

13.     Defendant Ali G. Hedayat ("Hedayat") has served as a director of the
Company since January 2017.

14.     Defendants Pappas, Walker, Glaspey, Larkin, Mink, Hill, and Hedayat
form the Board of Directors of U.S. Geothermal and are collectively referred to
herein as the "Board" or the "Defendants."

## III.   **Relevant Non-Parties**

15.   U.S. Geothermal Inc. (previously defined as "U.S. Geothermal") is a corporation organized and existing under the laws of the State of Delaware with its principal executive offices located at 390 E. Parkcenter Blvd., Suite 250, Boise, Idaho 83706.

16.   Ormat Technologies, Inc. is a Delaware corporation with its principal executive offices located at 6225 Neil Road, Reno, Nevada 89511.

17.   Ormat Nevada Inc. is a Delaware corporation and a wholly owned subsidiary of Ormat Technologies, Inc., with its principal executive offices located at 6225 Neil Road, Reno, Nevada 89511.

18.   OGP Holding Corp. is a Delaware corporation and a wholly owned subsidiary of Ormat Technologies, Inc., with its principal executive offices located at 6225 Neil Road, Reno, Nevada 89511.

19.   JCP Investment Partnership, LP, JCP Drawdown Partnership III, LP, JCP Investment Holdings, LLC, and JCP Investment Partners, LP are affiliated with JCP Investment Management, LLC (previously defined as "JCP Investment Management"), of which Defendant Pappas is Managing Member and owner. All such entities are organized under the laws of the State of Texas and maintain their principal executive offices located at 1177 West Loop South, Suite 1320, Houston, Texas 77027.

## THE DEFENDANTS' FIDUCIARY DUTIES

20.     By reason of the Defendants' former positions with the Company as officers and/or directors, they were in a fiduciary relationship with Plaintiff and the other public stockholders of U.S. Geothermal and owed them a duty of care, loyalty, good faith, candor, and independence.

21.     By virtue of their former positions as directors and/or officers of U.S. Geothermal, the Defendants, at all relevant times, had the power to control and influence U.S. Geothermal, did control and influence U.S. Geothermal, and caused U.S. Geothermal to engage in the practices complained of herein.

22.     To diligently comply with their fiduciary duties, the Defendants were prohibited from taking any action that:  (a) adversely affected the value provided to the Company's stockholders; (b) favored themselves or discouraged or inhibited alternative offers to purchase control of the corporation or its assets; (c) adversely affected their duty to search and secure the best value reasonably available under the circumstances for the Company's stockholders; (d) would provide the Defendants with preferential treatment at the expense of, or separate from, the public stockholders; and/or (e) contractually prohibited the Defendants from complying with or carrying out their fiduciary duties.

23.     In accordance with their duties of loyalty and good faith, the Defendants were obligated to refrain from:  (a) participating in any transaction

7

where the Defendants' loyalties are divided; (b) participating in any transaction where the Defendants receive, or are entitled to receive, a personal financial benefit not equally shared by the public stockholders of the corporation; and/or (c) unjustly enriching themselves at the expense or to the detriment of the public stockholders.

24.    Plaintiff alleges herein that the Defendants, separately and together, in connection with the Buyout, knowingly or recklessly violated their fiduciary duties, including their duties of loyalty, good faith, candor, and independence owed to the Company.

### CLASS REPRESENTATION ALLEGATIONS

25.    Plaintiff brings this action on behalf of himself and as a class action pursuant to Rule 23 of the Rules of the Court of Chancery on behalf of all other holders of U.S. Geothermal common stock who were harmed by Defendants' actions described below (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

26.    This action is properly maintainable as a class action because:

a.    The Class is so numerous that joinder of all members is impracticable. As of March 1, 2018, there were approximately 19,494,566 outstanding shares of U.S. Geothermal common stock.  The actual number

of public stockholders of U.S. Geothermal will be ascertained through discovery.

b.  There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including:

i)    whether the Defendants breached their fiduciary duties with respect to Plaintiff and the other members of the Class in connection with the Buyout;

ii)   whether the Defendants breached their fiduciary duty to obtain the best price available for the benefit of Plaintiff and the other members of the Class in connection with the Buyout;

iii)  whether the Defendants breached their fiduciary duty to disclose fully and fairly all material information within the Board's control in connection with the Buyout; and

iv)   whether Plaintiff and other members of the Class are entitled to damages as a result of the Defendants' wrongful conduct.

c.    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

d.    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

e.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class.

f.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

g.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## SUBSTANTIVE ALLEGATIONS

**I.    Relevant Corporate Background**

27.    Prior to the Buyout, U.S. Geothermal was a leading and profitable renewable energy company focused on the development, production, and sale of electricity from geothermal energy. The Company was then operating geothermal power projects at Neal Hot Springs, Oregon; San Emidio, Nevada; and Raft River,

Idaho for a total designed net output of approximately 45 mega-watts ("MWs"). The Company was also developing projects at the Geysers, California; a second phase project at San Emidio, Nevada; at Crescent Valley, Nevada; and the El Ceibillo project, located near Guatemala City, Guatemala. Through long-term agreements, it sells electricity and energy credits to Idaho Power Company, NV Energy, and Holy Cross Energy.

28.     Ormat Technologies is also engaged in the geothermal and recovered energy power business. Ormat Technologies designs, develops, builds, owns, and operates geothermal and recovered energy-based power plants. The Company's equipment manufacturing operations are located in Israel and its common stock trades on the NYSE and Israeli stock exchange. According to U.S. Geothermal, Ormat Technologies is the largest pure geothermal company in the world.

29.     JCP Investment Management is an activist hedge fund founded by Defendant Pappas on April 9, 2009. Defendant Pappas has complete investment discretion of the entire $130,000,000+ of assets under management by the fund. As outlined below, the fund has a track record of making concerted efforts to change the management of companies by securing seats on their boards and, after Defendant Pappas becomes publicly involved with a company or joins its board in connection with an activist campaign, the company is often sold in less than *one* year:

| Ticker | Name | Period[1] (Months) | Outcome |
|---|---|---|---|
| JAX[2] | J. Alexander's Corporation | 7 | Acquired |
| PTRY[3] | The Pantry, Inc. | 9 | Acquired |
| CST[4] | CST Brands, Inc. | 8 | Acquired |
| AMRE | AmREIT, Inc. | 5 | Acquired |
| MRFD[5] | Morgan's Foods, Inc. | 27 | Acquired |
| VVI[6] | Viad Corp. | 2 | Settlement |

---

[1]      Time period is measured from date of JCP's and/or Defendant Pappas' public involvement or placement on the target board, as applicable, up to and including the latest date by which the respective target company was acquired, the JCP-initiated proxy fight was settled or defeated, or, given the non-occurrence of either event, the present.

[2]      Activist Investor Adds to J. Alexander's Stake, March 15, 2012 (available at https://www.nashvillepost.com/business/area-stocks/blog/20463344/activist-investor-adds-to-j-alexanders-stake) ("Pappas . . . is part of a group led by Atlanta-based Privet Fund that wants to take over control of J. Alexander's board. His JCP Investment Management vehicle now owns about 3.5 percent of J. Alexander's.").

[3]      'Activist' Stockholder Opens Up About CST, The Pantry, Nov. 11, 2017 (available at http://www.cspdailynews.com/mergers-acquisition-growth/mergers-acquisitions-news/articles/activist-stockholder-opens-about-cst) (noting, with respect to the sale of The Pantry, Inc. and CST Brands, Inc., that "[i]n both cases, one of the shareholder groups creating that unrest was [JCP], a Houston-based group that analysts dubbed an 'activist' stockholder.").

[4]      Id.

[5]      Defendant Pappas forced his way on the board of Morgan's Foods, Inc. ("Morgan's") on February 20, 2012, less than two weeks after JCP filed a Schedule 13D reflecting JCP's 12.6% activist ownership stake in the company. See Schedule 13D filed by JCP on February 8, 2012. Defendant Pappas then served as Chairman of Morgan's board from January 2013 until May 2014, when the company was acquired by Apex Restaurant Management, Inc.

[6]      On February 20, 2015, JCP, which, along with its affiliates, beneficially owned approximately 1.6% of Viad Corp.'s ("Viad") outstanding common stock, notified Viad of its intent to nominate three director candidates at the company's upcoming annual shareholder meeting. On April 11, 2015, Viad and JCP entered into a settlement agreement, pursuant to which, among other things, Viad increased

Case 1:19-cv-00322-REB   Document 1-1   Filed 08/20/19   Page 14 of 66


| | | | Agreement |
|---|---|---|---|
| SMXMF[7] | Samex Mining Corp. | 8 | Settlement Agreement |
| JMBA[8] | Jamba, Inc. | 40 | Settlement Agreement[9] |

the size of its board and appointed Joshua Schechter (who previously served on the board of directors of the aforementioned The Pantry, Inc.) as a new director and as a member of the company's corporate governance and nominating committee, and JCP agreed to withdraw its notice of intent to nominate three director candidates. *See* Schedule 14A filed by Viad on April 15, 2015.

[7]     Defendant Pappas joined the board of Samex Mining Corp. ("Samex") pursuant to the company's settlement agreement with an activist shareholder. He served as a director of Samex from January 2013 to August 2013. Less than one year later, Samex filed for bankruptcy. *See* Fiesta Restaurant Group, Inc. Comments on Misleading JCP Presentation and Press Release, May 25, 2017 (available                                                                               at https://www.businesswire.com/news/home/20170525006088/en/Fiesta-Restaurant-Group-Comments-Misleading-JCP-Presentation) ("[Pappas] also neglects to mention his board service on Samex Mining Corp., where the company filed for bankruptcy less than one year after Mr. Pappas joined its board pursuant to a settlement agreement.").

[8]     *Id*. ("After forcing himself onto the [Jamba] board and audit committee in 2015 through an activist campaign, Mr. Pappas implemented a plan with similar features to the 'plan' proposed for Fiesta at Jamba Juice. Since then, [Jamba] has lost more than half of its market value and missed earnings for eleven consecutive quarters. To add insult to shareholder injury, according to its SEC filings, [Jamba] will now likely disclose a material weakness in internal controls, which has resulted in significantly delayed financial reporting and a possible delisting from NASDAQ.").

[9]     Jamba Inc. (JMBA) Agrees To Appoint Engaged Capital's Glenn W. Welling To Board, January 16, 2015 (available at https://www.insidermonkey.com/blog/jamba-inc-jmba-agrees-to-appoint-engaged-capitals-glenn-w-welling-to-board-337777/?singlepage=1) ("Under a settlement agreement with Engaged Capital and certain of its affiliates, [Jamba] agreed to appoint Mr. Welling and Mr. Pappas to its board, with terms expiring at the company's 2015 annual meeting of stockholders. At the same time, [Jamba] agreed to appoint . . . Mr. Pappas as a member of both the nominating and corporate

13

| KWH.UN[10] | Crius Energy Trust | 1 | Settlement Agreement |
|---|---|---|---|
| CWST[11] | Casella Waste Systems, | 7[12] | JCP Loses Proxy |

governance committee and the audit committee of the board . . . . On the other hand, Engaged Capital and [JCP] have agreed to vote their shares in favor of the election of the company's slate of directors at the 2015 annual meeting. Additionally, [JCP] will, among other things, withdraw its nomination of candidates to stand for election at the company's 2015 annual meeting. [JCP] and certain of its affiliates own about 2.3% of [Jamba's] outstanding shares[.]").

[10]    JCP Issues Letter to Unitholders of Crius Energy Trust, March 26, 2018 (available at https://globenewswire.com/news-release/2018/03/26/1453229/0/en/JCP-Issues-Letter-to-Unitholders-of-Crius-Energy-Trust.html) ("[JCP], a significant unitholder of [Crius], today issued a letter to the unitholders of Crius. . . and informed unitholders that it intends to nominate four highly-qualified candidates, Lalit Aggarwal, Anu Dhir, *Ali Hedayat* and James C. Pappas, for election to the Board of Directors of the Trust's administrator at the Trust's upcoming 2018 Annual General Meeting.") (emphasis added). Notably, Defendant Hedayat also served as a member of the Special Committee in connection with the U.S. Geothermal sale process. *See also* Crius and JCP Announce Settlement Agreement, April 30, 2018 (available at https://globenewswire.com/news-release/2018/04/30/1489716/0/en/Crius-and-JCP-Announce-Settlement-Agreement.html) ("[Crius] and [JCP] today announced that they have entered into a settlement agreement [], pursuant to which one JCP nominee, *Ali Hedayat* [], will be put forth for election to the board of directors of [Crius.]").

[11]    Fiesta Restaurant Group, Inc. Comments on Misleading JCP Presentation and Press Release, May 25, 2017 (available at https://www.businesswire.com/news/home/20170525006088/en/Fiesta-Restaurant-Group-Comments-Misleading-JCP-Presentation) (". . . Mr. Pappas' own ideas were soundly rejected by Casella shareholders. In fact, by the time Casella's annual meeting occurred, shareholders so strongly rejected Mr. Pappas' plan that Mr. Pappas withdrew his nominees and didn't even bother turning in the few voting proxies he did receive, disenfranchising these shareholders."); *see also* Casella Waste Systems Under Activist Pressure, October 13, 2015 (available at https://www.investopedia.com/articles/investing/101315/casella-waste-systems-under-activist-pressure.asp) ("In its most recent letter to Casella's board on Sept.

| | Inc. | | Contest |
|---|---|---|---|
| FRGI[13] | Fiesta Restaurant Group, Inc. | 9[14] | JCP Loses Proxy Contest |
| CASY[15] | Casey's General Stores, Inc. | 5 | Proxy Contest Pending |

10, JCP said it intended to nominate two members of its firm to Casella's board at the company's upcoming annual meeting on Nov. 6.").

[12] On April 28, 2015, JCP issued a press release announcing its nomination of the nominees for election at Casella Waste Systems, Inc.'s ("Casella") 2015 Annual Meeting. On, November 4, 2015, JCP, then the beneficial owner of approximately 5.7% of the outstanding Class A shares of Casella, announced its withdrawal of its slate of nominees. JCP and its affiliates appear to have ceased to be beneficial owners of more than 5% of Casella's stock as of July 22, 2016.

[13] Activist Investor Looking to Shake up Fiesta Restaurant Group's Board of Directors, February 1, 2017 (available at https://www.bizjournals.com/dallas/news/2017/02/01/activist-investor-looking-to-shake-up-fiesta.html) (". . . activist investor JCP Investment Management has nominated three candidates to shake up the Addison company's board of directors."); see also Activist Pushes Potbelly to Make Changes, July 17, 2017 (available at http://www.nrn.com/fast-casual/activist-pushes-potbelly-make-changes) ("Fiesta Restaurant Group Inc. recently beat back an effort for board seats by JCP Investment Management LLC.").

[14] JCP did not solicit enough votes for the election of its slate of director nominees to the board of directors of Fiesta Restaurant Group, Inc. ("Fiesta") at Fiesta's 2017 annual meeting of stockholders. See Fiesta's Form 8-K filed June 13, 2017. Following this defeat, JCP and its affiliates executed a Termination of Group Agreement pursuant to which JCP would no longer be a member of a Section 13D group and cease to be a reporting person for purposes of SEC filing requirements.

[15] JCP Issues Letter to Shareholders of Casey's General Stores, January 3, 2018 (available at https://www.prnewswire.com/news-releases/jcp-issues-letter-to-shareholders-of-caseys-general-stores-300576782.html) ("[JCP], BLR Partners LP and Joshua E. Schechter, together significant shareholders of [Casey's] who collectively own approximately $45 million of the Company's common stock, today issued an open letter to Casey's shareholders.") (emphasis added) (JCP's shareholder letter requested that "Casey's Board should immediately engage a financial advisor to explore all strategic alternatives, including a potential sale, merger or similar transaction in order to maximize shareholder value.").

30.    Notably, the shares purchased by JCP during its activist campaigns are traditionally purchased with working capital, which, as the Company has disclosed in several of its Form SC13D/A's, including those filed in connection with Defendant Pappas' activist campaign against U.S. Geothermal, "may include margin loans made by brokerage firms."[16] Upon information and belief, the potential influence of such margin loans on JCP's length of investment, along with Defendant Pappas' track record of securing sales in his activist campaigns within one year, raise the indicia of JCP's need and/or desire for liquidity in connection with its activist campaigns, including its campaign against U.S. Geothermal.

31.    In addition, in many of the instances in which JCP's activist involvement did not prompt an acquisition of his target company, JCP beneficially owned less than 10% of the respective company's outstanding common stock at all relevant times, and, in most instances, far less. Conversely, as noted above, JCP beneficially owns approximately *15%* of U.S. Geothermal's outstanding common stock.

_____

[16]    *See* Form SC 13D/A filed by JCP on January 25, 2018 in connection with JCP's holdings in U.S. Geothermal; Form SC 13D/A filed by JCP on June 7, 2017 in connection with JCP's holdings in Fiesta; and Form 13D/A filed by JCP on July 25, 2016 in connection with JCP's holdings in Casella.

32.     What is more, Defendant Pappas has a history of cherry-picking the same candidates to serve on the boards of the companies in which he takes an activist position. For example, during JCP's activist campaigns against The Pantry, Inc., and Viad, JCP secured a position for Joshua Schechter on both boards. More recently, three months after the announcement of the Buyout, JCP publicly disclosed its intention to nominate, among others, Defendant Hedayat – ***one of four members appointed to the special committee for U.S. Geothermal's sales process*** – to the board of directors of Crius Energy Trust.



██████████████████████████████████████████████

██████

## II.    The Flawed Sales Process

### A.    Ormat Approaches U.S. Geothermal, But The Board Opts to Pursue its Standalone Strategy

35.    Ormat originally reached out to U.S. Geothermal in July 2015, at which time the parties executed a nondisclosure agreement that contained a standstill provision that lasted until April 15, 2016. Ultimately, Ormat failed to make an offer that the Board considered sufficient, and, in March 2016, **the Board determined that continuing to execute as a stand-alone company was the best path for maximizing long-term stockholder value**.

### B.    Defendant Pappas Amasses a 15% Stake in the Company and the Board Abandons its Plans to Pursue Its Standalone Strategy and Begins a Sales Process

36.    From December 2015 to February 2016, Defendant Pappas, through JCP Investment Management, acquired a 5% stake in the Company. By mid-July 2016, he had increased his stake in the Company to over 15% of the outstanding shares. According to the January 25, 2018 Form SC13D/A filed on behalf of entities associated with JCP Investment Management, through those entities, Defendant Pappas purchased 938,360 shares of U.S. Geothermal for approximately $3,281,456 and 1,916,588 shares for approximately $8,724,372, resulting in an

average cost basis for the 2,854,948 shares held by entities associated with Defendant Pappas of only $4.20 per share.

37.     As is typical of any activist investor taking a large, aggressive stake in a publicly traded company, Defendant Pappas disclosed in his initial, February 2016 SEC filing regarding his increasing stake in the Company that he intended to "engage[] in communications with management and the Board of Directors" and with U.S. Geothermal stockholders regarding a number of issues, including, most notably – for the Board at least – "ownership structure . . . [and] board structure (including board composition)." Of course, directors of a publicly traded company know exactly what this means – that the activist intends to seek change and is willing to oust them to get it.

38.     Unsurprisingly, then, in light of this continuously increasing stake in the Company, at some point during this time and prior to the filing of the August 19, 2016 preliminary proxy statement for the annual stockholders meeting, Defendant Pappas convinced the Board to approve and recommend him for election to the Board. On September 30, 2016, Pappas was elected to the Board. And, like clockwork, shortly after Defendant Pappas' appointment to the Board – and despite the Board's March 2016 determination that "continuing to execute the company's strategic growth plan was the best path to maximizing long term stockholder value" – on December 1, 2016, in response to a November 2016

indication of interest from Party A, the Board decided to reevaluate potential transactions. Defendant Pappas was appointed to the special committee for this renewed sales process (the "Special Committee").[17]

39.    As one of four members of the Special Committee, Defendant Pappas served an important role as one of the chief negotiators of the Buyout. However, Defendant Pappas in particular appears to have occupied a greater role in this process. For example, and as outlined in greater detail below, he was solely responsible for interviewing the final candidates to serve as financial advisor. He also appears to have personally chased Party B out of the bidding process when it made a non-cash offer, as activist investors generally prefer cash-out mergers to close their investments. Further securing his control over the Company, in addition to serving on the Special Committee, Defendant Pappas was also named to the Company's Executive Committee after former CEO Gilles was removed, which, in addition to overseeing the search for a new CEO, guided the Company on key strategic initiatives and capital allocation – in effect acting as temporary CEO.

---

[17]    As originally configured, there were three members of the Special Committee: Defendants Hill, Larkin, and Pappas. However, for unstated reasons, on January 25, 2017, the Board resolved to increase its size from seven to eight directors. Effective February 1, 2017, Defendant Ali Hedayat – another hedge fund founder – served as the eighth member of the Board and the fourth member of the Special Committee. The Board was subsequently reduced back to seven members when former CEO Gilles was ousted from the Company.

### C.   The Renewed Sales Process

40.    From the outset of the renewed sales process that followed Defendant Pappas' investment in the Company and accession on the Board, the Company itself determined that its value far exceeded the ultimate Merger Consideration and the Company received offers that far exceeded the ultimate Merger Consideration. For example, on November 22, 2016, Party A submitted a non-binding indication of interest of $5.30 to $5.93 per share. Thereafter, Mr. Gilles, U.S. Geothermal's former CEO, made contact with four public and private geothermal companies and one private equity fund that had previously expressed interest in a potential transaction to explore their interest in making a renewed indication of interest. While waiting for these renewed IOI's, the Special Committee met and concluded "that the range suggested by Party A was low" and, on December 13, 2016, when Mr. Gilles and Defendants Larkin and Glaspey met with representatives of Party A, Defendant Larkin indicated that an offer in the range of $6.00 to 6.50 per share would be more compelling to the Special Committee.

41.    In the interim, Defendant Pappas interviewed the two preferred choices of the Special Committee for financial advisors. On December 15, 2016, apparently without any further review except that performed by Defendant Pappas, the Special Committee engaged ROTH as its financial advisor.

42.     On January 13, 2017, the Company received two publicly disclosed renewed indications of interest. Specifically, on that date, the Company received (1) a written, non-binding proposal from Party B for the purchase of certain of the Company's subsidiaries and (2) a written, non-binding proposal from Party C to acquire the Company's shares at a non-binding price of $6.50 per share.

43.     

18

22







███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

45.     On January 17, 2017, and consistent with his need and/or desire for liquidity, Defendant Pappas personally spoke with representative of Party B to demand that it modify its proposal to become a cash purchase for all of the Company's shares. Later, in April 2017, Party B informed Defendant Pappas that it was withdrawing from the process.

46.     On the following day, January 18, 2017, the Special Committee met and determined that **all** of the current bids were "inadequate." During the week of January 30, 2017, Party C executed a confidentiality agreement and conducted due diligence and, on or about March 6, 2017, Party C indicated that it was not interested in moving forward. This is the last mention of Party C in the Background of the Merger Section of the Proxy.

47.     Contemporaneously, on March 3 and March 15, 2017, respectively, Party A indicated that, while its prior proposal remained in place, it would not be increasing its bid, and Party D submitted a proposal for a share exchange

26

transaction that implied a price per share consideration of approximately $4.66 per share. Later, on March 16, 2017, Ormat indicated that, subject to renewed due diligence, its indicative range for the whole Company implied a price of approximately $4.25 to $4.48 per share. Although Ormat's bid was facially and significantly inferior to all other current offers, Defendants Larkin, Pappas, and Hedayat met with representatives of Ormat on May 9, 2017, to discuss the terms on which Ormat might be willing to acquire the Company. Contemporaneously, in mid-May 2017, Party A informed Mr. Gilles that its prior bid may not be its final offer.

48.     By mid-to-early 2017, the Board appears to have decided to pursue a sale. To this end, on April 24, 2017, the Company announced that it would not extend the employment agreement for its CEO, Mr. Gilles, beyond its current term, which was set to expire on July 18, 2017, but that it was discussing a role for Mr. Gilles as an outside advisor to the Company after his agreement expired.

49.     In late May, Defendant Pappas discussed a potential bid with Party F, and Defendant Hedayat had further conversations with Ormat and joint bidder Party D/E.[19] On June 1, 2017, representatives of the Company held a videoconference with representatives of Ormat, during which preliminary terms for a proposed transaction were discussed, but no agreement on valuation was reached.

---

[19]     In the interim, Party D had begun working with a partner, Party E.

Shortly thereafter, in early June 2017, the Special Committee demanded that the "remaining active parties, including Party A and Party D/E, submit their final proposals by mid-June."

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████

51.     On June 9, 2017, in an unusual and non-traditional move, U.S. Geothermal sent Ormat proposed terms for a letter of intent for the acquisition of the Company by Ormat. In other words, U.S Geothermal proposed an acquisition of itself by Ormat, not the other way around. It does not appear that any other bidder was provided with the same proposed terms. Days later, on June 16, 2017, Ormat submitted a proposal to purchase the Company's shares at a range of $5.11 to $5.80 per share.

52.     In the meantime, on June 14, 2017, Party D/E submitted a joint proposal for an acquisition of assets for $90 million, plus the assumption of outstanding debt. The Special Committee rejected the consideration as inadequate and, on the next day, Party D/E raised its offer to $120 million (which implied a value per share of approximately $6.15 per share based on the amount of U.S. Geothermal shares outstanding as of March 1, 2018). After Defendant Hedayat

encouraged Party D/E to present a proposal for the acquisition of U.S. Geothermal's shares, rather than assets, on June 20, 2017, Party D/E submitted a revised proposal to acquire U.S. Geothermal's shares for $6.00 per share.

53.     Finally, although Party A did not submit a revised proposal in mid-June, its prior proposal of $5.30 to $5.93 per share had not been withdrawn. Nonetheless, according to the Proxy, the Special Committee regarded the possibility of completion of a transaction with Party A to be lower than compared to a transaction with Ormat or Party D/E.

54.     On June 22, 2017, Party D/E submitted a revised proposal of $6.25 per share and, on June 24, 2017, the Special Committee recommended, and the Board approved, moving forward with Party D/E. On the following day, Ormat proposed revising its bid to eliminate the price range in favor of a $5.80 per share price, but did not change any other terms of or otherwise increase its bid.

55.     Then, on July 3, 2017, Party G, which had been having intermittent communications with representatives of the Company, submitted a proposal to acquire the Company for $6.75 per share and the potential for an additional $0.25 per share under certain circumstances. In response, Defendant Pappas and a representative of ROTH contacted Party D/E to offer Party D/E the opportunity to submit a revised offer. Thereafter, on July 5, 2017, Party G submitted a revised proposal reflecting a slightly modified provision for the potential increase in the

purchase price and Defendant Hedayat spoke with Party D/E to discuss the receipt of the higher bid and to give Party D/E the opportunity to increase its bid. Thereafter, Party G provided the Special Committee with additional information regarding its ability to finance any proposed transaction.



56.     On July 6, 2017, the Company entered into an exclusivity agreement with Party G. However, shortly thereafter, Party G informed Defendant Larkin that additional foreign regulatory approvals would be required prior to closing a potential transaction, refused the Company's request for a reverse break up fee, and postponed further due diligence. Party G resumed due diligence in late July.





59.    Despite this plain interest, on August 3, 2017, after Party G informed

Defendant Larkin that it was withdrawing from the process because the Company's

development assets were not what Party G desired, **according to the Proxy**, the Special Committee determined to have Defendants Hedayat and Pappas contact **only** Parties F and D/E to determine whether those parties had any continued interest in the Company. According to the Proxy, after this contact and "[d]ue to the lack of information from Party F regarding its source of financing or partner in a potential transaction, the special committee had significant concerns relating to the probability of completion of a transaction with Party F and did not pursue discussions further." The Company would instead go on to pursue exclusivity with Party D/E.









### E.    Exclusivity with Party D/E

62.    Instead, on August 7, 2017, the Special Committee recommended, and the Board approved, entering into an exclusivity agreement with Party D/E for a period of 30 days. Barely a month later, on September 13, 2017, the Special Committee was informed that Party D/E may be unable to confirm its initially proposed price of $6.25 based on its view of the tax equity/financing and pricing assumptions at certain of U.S. Geothermal's project sites. The Special Committee thereafter sent a notice regarding the termination of the exclusivity period.

63.    On September 21, 2017, the Special Committee was informed that Party D and Party E had ended their partnership relating to the joint proposal. During discussions with Party E throughout the process, Party E's interest in U.S. Geothermal related to its operating assets and it expressed no interest in acquiring

the entire company absent a partner such as Party D, but the Special Committee had previously determined that a sale of only a portion of the assets of U.S. Geothermal was not the preferred structure or most beneficial to stockholders, so the Special Committee did not pursue a separate sale of the operating assets to Party E.

### F.    Exclusivity with Ormat

64.    On September 22, 2017, Party D submitted a proposal without Party E that contained a proposed price per share of $5.40, which could be increased by an additional $0.85 per share assuming certain milestones were met prior to closing. Thereafter, Defendant Hedayat contacted Ormat to discuss whether Ormat had an interest in renewing its proposal. ████████████████████████████████ ██████████████████ Relatedly, the Special Committee met and determined that Party D's standalone proposal was "inadequate, no longer had the support of a strong financial partner in Party E and was unlikely to trigger an increase in price per share."

65.    Nonetheless, on September 28, 2017, the Special Committee determined to go back to Party D to give them another opportunity to put together an offer that had no financing contingency and a higher price and simultaneously discussed the terms of an exclusivity agreement with Ormat. The Special Committee recommended to the Board, and the Board authorized, that the

Company pursue a transaction with Ormat as outlined in its initial proposal with a forty-five day exclusivity agreement. ████████████████████████████████████

████████████████████████████████████████████████████████

66.     In late September, in connection with the possible failure of the sales process, Defendant Hedayat reviewed operations and cash flows for U.S. Geothermal assuming it remained a stand-alone company, the development projects that remained undeveloped, as well as a number of other assumptions regarding costs and anticipated cash flow. This review, which was discussed with the members of the Executive Committee of the Board – which consisted of Defendant Glaspey and Defendants Hill, Pappas and Hedayat (three of the four members of the Special Committee) – placed a potential value (not trading price) of the outstanding shares at the end of 2018 of approximately **$5.85 per share**.[20]

67.     On October 3, 2017, the Special Committee received (1) a written proposal from Ormat to acquire the Company at an indicative price of $5.75 per share and (2) written confirmation from Party D of its September 22 proposal of $5.40 per share, which could be increased by an additional $0.85 per share assuming certain milestones were met prior to closing. During the following two

---

[20]     This valuation was an intrinsic valuation and did **not** account for a premium that would be associated with a buyout. Importantly this valuation was specifically shared with the executive committee of the Board, which included Defendants Glaspey, Hill, Pappas, and Hedayat – *i.e.*, three of the four members of the Special Committee.

weeks, Defendants Pappas and Hedayat held multiple discussions with Ormat regarding its bid and, on October 13, 2017, Defendant Hedayat sent Ormat proposed forms of a proposal letter and exclusivity agreement. On October 20, 2017, Party D submitted a *sua sponte* revised proposal that contained an indicative bid of $5.60 per share with the potential to increase the per share price to $6.25 based on the occurrence of certain events prior to close. Simply stated, throughout the sales process, Party D continuously indicated that it was serious about acquiring U.S. Geothermal, and it is incredible to think that Party D would continue devoting its resources and expressing serious interest about such an acquisition in September and October of 2017 if it lacked a sound financing source.

68.     Nonetheless, on the same day, the Special Committee determined to proceed with Ormat. Consistent with Defendant Pappas' need and/or desire for liquidity, the decision appears to have been based exclusively on certainty of closing, and this consideration appears to have eclipsed the potential to secure greater value for stockholders from other bidders. More specifically, according to the Proxy,

> [i]n determining to proceed with Ormat, the special committee noted that the firm price in the Party D proposal was less than the Ormat proposal. The special committee discussed the events that would trigger the contingent price increase from $5.60 to $6.25 in the Party D offer and determined those events were highly

speculative. Ultimately, the special committee concluded that Party D's bid was economically inferior and less credible than the Ormat offer due to concerns over Party D's ability to finance payment of the purchase price and Party D's need to complete due diligence. The special committee also discussed the initial bid received in November 2016 from Party A with a price range of $5.30 to $5.93, as that proposal remained outstanding. The proposal from Party A would have been subject to increased U.S. regulatory requirements to complete the transaction, such as CFIUS, and could have also been subject to foreign currency control regulations. In addition, the midpoint of Party A's price range was less than Ormat's offer. As a result, and due to the special committee's confidence in Ormat's ability to complete the transaction, the special committee concluded that the Ormat offer remained superior to the offer from Party A.

69.    The Board's preference for the progression of a deal over greater value was again demonstrated on October 27, 2017, when the Company received an unsolicited inquiry from counsel to a private equity fund, the value of which is not disclosed in the Proxy. Rather than delay – even briefly – the execution of an exclusivity agreement with Ormat, **the Special Committee decided <u>not</u> to pursue this potentially valuable offer for stockholders**. Instead, later that day, copies of the Ormat proposal and exclusivity agreement were distributed to the Board and, on October 30, 2017, U.S. Geothermal entered into a forty-day nondisclosure and exclusivity agreement with Ormat with a working price of $5.75 per share – 10 cents per share **below** what the Company had internally valued itself at less than a month prior; despite the fact that it had received offers of as much as $5.93 from Party A, $6.25 from Party D/E, ▮▮▮▮▮▮▮▮▮▮; and despite the fact that both

40

Party A's ████████ offers remained outstanding and Party D (alone) had made a new offer of $5.60, which could be increased to as much as $6.25 per share.

### G.   The Board Lowers U.S. Geothermal's Projections

70.    In the interim, the Board began the inevitable process of lowering the Company's projections to make the impending Ormat deal appear palatable.  As noted above, in late September 2017, in connection with the possible failure of the sales process, Defendant Hedayat reviewed the Company's prospects as a stand-alone entity with the members of the Executive Committee of the Board, which **itself** ultimately placed a potential value of the outstanding shares at the end of 2018 of approximately **$5.85 per share**.

71.    Having received no bids from Ormat or Party D above this amount, in early October 2017 the Board "continued to consider the company's alternatives and its strategy to best build stockholder value should the company not proceed with a sale transaction" and, "[a]s a result, during October 10-11, members of the executive committee of the Board met in Boise for meetings regarding the company's strategy going forward as a stand-alone company." According to the Proxy, the "focus of the executive committee was the pricing strategy used by U.S. Geothermal when bidding for PPAs" and the Company's purported mid-October adoption of "a revised, more aggressive pricing strategy when submitting bids."

72.     Then, on October 20, 2017, according to the Proxy, "management informed the special committee that the required capital expenditures for certain expansion projects were increasing. This information, as well as recent maintenance issues, caused the members of the special committee to place less value on the expansion projects and its pricing expectations in any potential offer." And, on November 14, 2017, according to the Proxy, a recent PPA bid that the Company had submitted for a PPA relating to Geysers, one of its development projects, was not accepted, which would likely delay development at Geysers, potentially resulting in increased costs related to that development. According to the Proxy, "[t]his delay, combined with increased capital costs at an expansion project and potentially increased transmission costs at San Emidio Phase II, also caused members of the special committee to lower the value it placed on U.S. Geothermal's expansion and development projects."

### H.     "Negotiations" with Ormat

73.     Having secured exclusivity, Ormat immediately moved to decrease its price.  Citing "concerns over the level of the premium . . . [and] with a number of working capital items and operational issues," Ormat reduced its proposed price per share to a range of $4.82 to $5.20 in mid-December 2017. Although the original forty-day term of the exclusivity agreement had since run and the parties were operating under successive ten-day extensions thereto, rather than simply

wait out the exclusivity agreement and contact ██████████████████ ██████████████████ or the new private equity firm that had contacted the Company on October 27, 2017, Defendant Hedayat proposed to Ormat a $5.45 per share merger consideration, plus a special dividend of $0.10 per share under specified circumstances. In response, Ormat first offered $5.40 per share plus a potential special dividend of up to $0.15, and later offered simply $5.45 per share – ████████████████████████████████████████; 15 cents per share below Party D's absolute minimum offer; 53 cents per share below the $5.93 high end of Party A's still outstanding offer; and 40 cents per share below the Company's own internal valuation.

74.     When the Special Committee met to consider this offer, it specifically determined to disregard the concerns over the premium, as it "did not regard the premium as relevant to the discussions regarding price." Instead, it decided to counter with a price range of $5.50-$5.55 per share. Consistent with the Defendants' focus on the procession of a deal, rather then securing the best deal available, on December 19, 2017, the Special Committee recommended to the Board, and the Board approved, the extension of the exclusivity period to January 2, 2018, and the continuation of negotiations with Ormat. The parties executed an extension of the exclusivity period until January 2, 2018.

75.    On January 5, 2018, after the exclusivity period with Ormat expired, Party D confirmed to the Special Committee that its previous offer was still open and valid. Thus, Party D now had a facially superior offer of $5.60 per share with potential triggering events to increase the price to $6.25 per share. However, Ormat had already performed due diligence, both in the previous sales process and the current, such that Defendant Pappas would have preferred the Buyout with Ormat to finalize a transaction as quickly as possible.

76.    Unsurprisingly, the Special Committee thereafter recommended that the Board continue negotiations with Ormat, despite its increasingly inferior offer. Specifically, on January 8, 2017, the Special Committee met and determined that the "increased risk associated with a transaction with Party D as a result of its incomplete due diligence and need to obtain financing" – creatures, of course, of the Special Committee's decision to grant Ormat exclusivity for almost two months – did not warrant pursuing the higher offer from Party D. In other words, the Special Committee again chose the progression of a deal over the terms of the deal.

77.    The Special Committee then discussed seeking a higher price from Ormat in response to the reconfirmation of the offer from Party D, but, "based on prior input from Ormat that its board had approved the price of $5.45 per share and would not pay more," determined that seeking an increased price from Ormat at

this stage would be rejected and could put the transaction at risk. In other words, yet again, the Special Committee chose the progression of a deal over the terms of the deal.

78.     The Special Committee therefore recommended to the Board that the Company should continue to work with Ormat and that the credibility of the bid from Ormat and greater certainty of closing offset the higher bid from Party D. On January 9, 2018, the Board accepted this recommendation and approved another extension of exclusivity with Ormat, until January 22, 2018. ███████████

███████████████████████████████

## I.     The Board Quickly Wraps Up the Sales Process Even Though Superior Bids Remain Outstanding

79.     Thereafter, the parties negotiated the remaining terms of the Merger Agreement. On January 23, 2018, ROTH rendered its fairness opinion to the Board and the Special Committee recommended, and the Board then unanimously voted to approve and adopt, the Merger Agreement at $5.45 per share. On January 24, 2018, Ormat approved and executed the Merger Agreement, and each company issued a press release announcing the Buyout:

## U.S. GEOTHERMAL INC. ENTERS INTO DEFINITIVE AGREEMENT TO BE ACQUIRED

## BY ORMAT TECHNOLOGIES INC. FOR $5.45 IN CASH PER SHARE

**BOISE, IDAHO –** January 24th, 2018 - U.S. Geothermal Inc. (the "Company") (NYSE American: **HTM**) announced today that it has entered into a definitive merger agreement under which a wholly owned subsidiary of Ormat Technologies, Inc. ("Ormat") (NYSE: **ORA**) will acquire the Company for $5.45 per share in an all cash transaction.

The agreement, which has been unanimously approved by both companies' Boards of Directors, represents a premium of approximately 28.5% to the prior day closing stock price on January 23rd, 2018.

### Statement by Doug Glaspey, a Founder and Chief Executive Officer of US Geothermal

"We are proud that Ormat, the industry leader in geothermal development, recognized our company's value and have confidence in their ability to successfully develop the US Geothermal asset base," said Doug Glaspey, CEO of US Geothermal. "This transaction provides compelling value to our stockholders and is a testament to the hard work and efforts of our talented team members."

### Statement by Ormat

"US Geothermal has developed a high-quality portfolio of geothermal assets," said Isaac Angel, CEO of Ormat Technologies. "As part of Ormat, we will leverage our core capabilities to help improve generation and enhance efficiency of these assets while also working to advance expansion opportunities. With this transaction, we demonstrate again the implementation of our business strategy to grow our business with accretive M&A transactions.

### Transaction Details

46

The transaction is not subject to a financing condition and is expected to close during the second quarter of 2018, subject to the approval of US Geothermal stockholders and the satisfaction of customary closing conditions, including applicable regulatory approvals.

Certain funds advised by JCP Investment Management, LLC, which own approximately 15.0% of the outstanding shares of US Geothermal, as well as the directors and officers of US Geothermal have entered into an agreement to vote in favor of the transaction.

ROTH Capital Partners, LLC acted as financial advisor and Dorsey & Whitney, LLP acted as legal counsel to US Geothermal.

80. At the time that the Board executed the Merger Agreement, no less than two superior bids remained outstanding. *First*, Party D's October 20, 2017 bid of $5.60 per share with potential triggering events to increase the price to $6.25 per share remained outstanding.



## IV.   <u>The Merger Was the Result of a Conflicted Process</u>

82.    The Merger Agreement and the insufficient Merger Consideration were the result of a flawed and conflicted process.  For their part, the Special Committee and the larger Board acceded to the sale because they had much to lose from a public ouster at the hands of Defendant Pappas and little to gain from standing up to him and securing a nominally higher Merger Consideration. And, for his part, Defendant Pappas got exactly what he wanted – a profitable exit

strategy for his investment in U.S. Geothermal.

A.    **The Non-Pappas Defendants**

83.    *First*, the Non-Pappas Defendants acceded to the Pappas-induced sale to protect their reputations and to avoid a potentially career-ending and reputation-killing proxy fight loss, which could have affected their other business interests, their positions in other companies in which they worked, and their positions on the other boards on which they served. As outlined below, many of these Defendants served on multiple boards and/or had significant business interests beyond U.S. Geothermal – interests that could be damaged by a public proxy fight loss. For example, in addition to U.S. Geothermal:

- Defendant Larkin currently serves on the board of the following companies: Esrey Energy Ltd., Condor Resources Ltd., Tyner Resources Ltd. Gstaad Capital Corp., Westbridge Energy Corp., and Velocity Minerals Ltd. In addition, since 1983, Defendant Larkin has also been the President of the New Dawn Group, an investment and financial consulting firm, and a director and officer of various companies listed on Canada's TSX Venture Exchange.

- Defendant Hill is a corporate lawyer with Stoel Rives with experience in, among other things, corporate governance and mergers and acquisitions. He is also serving his fourth term as one of seven Governor-appointed directors (and is currently Chair) of the Idaho Energy Resources Authority, an instrumentality of the State of Idaho with the authority to finance the construction of electric generation and transmission projects for investor-owned, municipal and cooperative electric utilities, and certain renewable energy projects for independent developers. In addition, Defendant Hill serves as a member of the Board of Governors of the Andrus Center for Public Policy at Boise State University.

49

- Defendant Hedayat is the founder and Managing Director of Maryana Capital in Toronto, Canada and serves as a director for Restaurant Brands International Inc., a position that has resulted in significant publicly-reported annual income for Defendant Hedayat (including an option grant in 2016 with a notational value of $1,000,000 and an award of restricted share units (RSUs) in lieu of cash worth $100,000).

- Defendant Glaspey currently serves as a director of Thunder Mountain Gold, Inc. and as President of the Geothermal Energy Association.

- Defendant Mink is currently the President of Mink GeoHydro Inc. and serves on the board of the Geothermal Resources Council.

84.    A public proxy fight loss to JCP Investment Management – which controlled almost 15% of the Company – and the forced removal from the U.S. Geothermal Board would have placed each of these Defendant's other positions in peril, thereby threatening their very livelihoods. Indeed, by way of example only, Defendants Larkin, Hedayat, Glaspey, and Mink all serve on the boards of private or publicly-traded companies. A public ouster from another publicly-traded company's board would place their qualifications into doubt and would make them less attractive as a board member on the companies for which they already work, as well as for new board positions. Similarly, Defendant Hill makes his living as a corporate lawyer, with experience in mergers and acquisitions no less. His business, to say nothing of his reputation, would surely suffer if he were forcibly removed from a public company board. Finally, Defendant Hedayat is the founder and Managing Director of a private equity firm, such that his business regularly requires him to sit on the boards of portfolio companies. Again, a public ouster

from the board of a publicly-traded company would place this very livelihood at risk.

85.     *Second,* the reputational and financial losses that these Defendants would have suffered as a result of a public ouster at the hands of Defendant Pappas far outweighed any nominal increase in value they may have secured for themselves had they fairly negotiated for U.S. Geothermal's non-insider stockholders. That is because the Non-Pappas Defendants were not heavily invested in U.S. Geothermal and much of their investment was in the form of options. As of December 31, 2018, the Non-Pappas Defendants held, collectively, only approximately 371,000 shares of U.S. Geothermal common stock and 482,020 options to purchase U.S. Geothermal stock, as outlined below:

- Defendant Walker beneficially owned only 17,275 U.S. Geothermal shares and 80,553 U.S. Geothermal options;

- Defendant Glaspey beneficially owned only 131,614 U.S. Geothermal shares and 205,695 U.S. Geothermal options;

- Defendant Larkin beneficially owned only 67,470 U.S. Geothermal shares and 80,553 U.S. Geothermal options;

- Defendant Mink beneficially owned only 24,729 U.S. Geothermal shares and 73,887 U.S. Geothermal options;

- Defendant Hill beneficially owned only 67,470 U.S. Geothermal shares and 24,666 U.S. Geothermal options;

- Defendant Hedayat beneficially owned only 130,000 U.S. Geothermal shares and 16,666 U.S. Geothermal options.[21]

86.     This means that, had these Defendants actually secured more value for U.S. Geothermal's stockholders, they stood to gain very little for each incremental amount secured:

| Relevant Defendant | Shares (including options) | Shares (without options) | Options | Max Potential Increase Assuming Sale @ $6.50[22] |
|---|---|---|---|---|
| Walker | 97,828 | 17,275 | 80,553 | $102,719.40 |
| Glaspey | 337,309 | 131,614 | 205,695 | $734,376.42 |
| Larkin | 148,023 | 67,470 | 80,553 | $155,424.15 |
| Mink | 98,616 | 24,729 | 73,887 | $237,570.93 |
| Hill | 24,666 | 0 | 24,666 | $55,691.88 |
| Hedayat | 146,666 | 130,000 | 16,666 | $171,165.28 |
| **TOTAL** | 853,108 | | | **$1,456,938.06** |

87.     In other words, and as is apparent, had these Non-Pappas Defendants done what was best for U.S. Geothermal's non-insider stockholders and chosen to contradict Defendant Pappas and pursue a sale to ███ a higher-priced sale to

---

[21]     In connection with the Merger, all outstanding and unexercised U.S. Geothermal stock options, whether vested or unvested, were canceled with the holder becoming entitled to receive from U.S. Geothermal (as the surviving corporation in the merger and a wholly owned subsidiary of Ormat) payment of cash, without interest and less applicable withholding tax, equal to: (a) $5.45 minus the per-share exercise price of such stock option multiplied by (b) the total number of shares subject to such stock option. According to the Company's Annual Report, as of March 1, 2018, these directors holdings became even smaller.
[22]     ████████████████████████████████████████████████
████████████████████████████████████████████████

another bidder that would have taken longer to consummate, or a standalone strategy, they stood to gain, individually and collectively, very little.  However, for that small again, they risked a near-certain ouster at the hands of Defendant Pappas – one that could have resulted in them losing their other lucrative employments and board positions. Stated differently, the relatively miniscule amounts they these Defendants stood to gain from defying Defendant Pappas and pursuing a sale to ████, a higher-priced sale to another bidder that would have taken longer to consummate, or a standalone strategy simply were not material in comparison to the sums these Defendants made in their other employments, as a result of their other board memberships, and in cashing out their stock options early (as noted below). By way of example only, Defendant Hill – who served on the Special Committee – held zero shares, had virtually no financial incentive to maximize the per share return for U.S. Geothermal stockholders, and every incentive (1) not to be involved in a public proxy fight loss after having been on the U.S. Geothermal Board for barely more than a year, and (2) to cash out his stock options and maintain his professional reputation so as to not place his other employments at risk. Indeed, and by way of example only, for every 10 cents of greater consideration they secured for stockholders, the Non-Pappas Defendants stood to **collectively** make just $85,310.80 more.

88.    *Finally*, as alluded to above, in addition to the fact that the Non-

Pappas Defendants stood to lose far more in a proxy fight to Defendant Pappas than what they stood to gain in, for example, a sale to █████ the Merger also had the added benefit of providing these same Defendants with liquidity and easy money by cashing out their options. As of December 31, 2017, the Non-Pappas Defendants collectively held approximately 482,020 U.S. Geothermal options – all of which will fully vest and be cashed out upon the consummation of the Buyout – as outlined below:

| Name | Options ($) | Consideration ($) |
|---|---|---|
| Douglas J. Glaspey | 205,695 | 380,201.97 |
| Kerry D. Hawkley | 134,394 | 238,919.58 |
| Ali Hedayat | 16,666 | 17,165.98 |
| Randolph J. Hill | 24,666 | 29,792.58 |
| Paul A. Larkin | 80,553 | 147,356.13 |
| Leland L. Mink | 73,887 | 134,024.13 |
| James C. Pappas | 24,666 | 29,792.58 |
| John H. Walker | 80,553 | 147,356.13 |
| Jonathan Zurkoff | 128,860 | 227,337.20 |
| All Officers & Directors | 769,940 | 1,351,946.28 |

Finally, in addition to these Merger-related payments, certain members of the Board also stood to gain further cash payments in connection with the Buyout, as outlined below:

| Name | Estimated Payment [1] ($) |
|---|---|
| Leland L. Mink | 39,500 |
| Paul A. Larkin | 75,362 |
| John H. Walker | 43,700 |
| Ali Hedayat | 48,550 |
| James C. Pappas | 50,025 |
| Randolph J. Hill | 59,325 |
| Total Non-Employee Directors | 316,463 |

89.    In short, these Defendants did what was easiest and financially safest for them and agreed to the Pappas-induced sale to Ormat, which: (1) protected

their reputations and other lucrative employment and board positions while (2) providing them with easy liquidity. Protecting their professional reputations while also receiving that windfall liquidity was, quite simply, a far better option than a public and notorious proxy fight loss to an activist investor and the reputational damage that would accompany it. In short, the risk of a public ouster at the hands of Defendant Pappas to these Non-Pappas Defendants' personal and financial well-being far outweighed any nominal increase in value they may have secured for themselves had they actually secured fair value for U.S. Geothermal's non-insider stockholders.

**B.    Defendant Pappas**

90.    Finally, Defendant Pappas was conflicted because his interests diverged from those of the Company's public, non-insider stockholders. That is because JCP Investment Management, like all activist investors, was seeking a quick payday at the expense of the Company's long term-value. The Merger with Ormat was this deal, and, as noted above, from the very beginning of his acquisition of U.S. Geothermal stock, Defendant Pappas threatened a potential change in Board composition if he did not get his way. For these reasons, the Board did not pursue higher-value, but potentially less-certain, bidders, eschewing them for the certainty that Ormat offered. What is worse, in so doing, the Board virtually ignored several competing offers, and ███████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████

91.     Nonetheless, that is what happened, as the Board acceded entirely to Defendant Pappas' need and/or desire for a quick payday at the expense of the Company's long term-value. And that is exactly what Defendant Pappas got. As noted above, according to the January 25, 2018 Form SC13D/A filed on behalf of entities associated with JCP Investment Management, through those entities, Defendant Pappas purchased 938,360 shares for approximately $3,281,456 and 1,916,588 shares for approximately $8,724,372, resulting in an average cost basis for the 2,854,948 shares held by entities associated with Defendant Pappas of only $4.20 per share. **The Merger Consideration of $5.45 per share represents a 30% return for JCP Investment Management's brief investment in U.S. Geothermal.[23]**

## V.     The Merger Did Not Provide Adequate Value to Stockholders

---

[23] This return is consistent with Defendant Pappas' investment theory, as he professed while discussing his activist involvement in the sales of The Pantry, Inc. and CST Brands, Inc. at CSP Magazine's November 2017 Outlook Leadership Conference: "Single-digit returns on capital spent are [not acceptable]… [y]ou need at least double [digits]." *See* ‘Activist' Stockholder Opens Up About CST, The Pantry, Nov. 11, 2017 (available at http://www.cspdailynews.com/mergers-acquisition-growth/mergers-acquisitions-news/articles/activist-stockholder-opens-about-cst).

92.    Pursuant to the terms of the Merger Agreement, U.S. Geothermal stockholders received $5.45 in cash for each share of U.S. Geothermal common stock that they owned. This consideration as inadequate and undervalued the Company.

93.    This is perhaps best illustrated by the fact that Company most recently valued itself at $5.85 per share – without any account for a premium associated with a merger or takeover. And, consistent with this valuation, the Company's intrinsic value was on the rise prior to the announcement of the Merger. According to the Company's November 9, 2017 press release announcing its third quarter 2017 financial and operating results, the Company experienced its twentieth consecutive quarter of positive cash flow from operations and EBITDA. In addition, operating revenue for the first nine months of 2017 was $21.56 million, compared to $20.90 million in the prior year period.

94.    These favorable financial results prompted the Company to revise its 2017 USG Portion Guidance upward, such that Adjusted EBITDA, previously estimated to be in the range of $9-12 million, was now expected to be in the range of $11-13 million, and net income, as adjusted, previously estimated to be in the range of $1-4 million, was now expected to be in the range of $2-5 million – reflecting increases at or near 20% for both metrics.

95.    In commenting on U.S. Geothermal's growth plans during the Company's third quarter 2017 earnings conference call, Defendant Glaspey (the Company's Interim CEO, COO, and President) noted that "several new development projects can be constructed in 2018, which can add three to six net megawatts of generation." Such growth would demonstrate nearly a 15% increase over the Company's current net output of approximately 45 MWs.

96.    This anticipated increase came just months after the Company updated its San Emidio reservoir estimate in connection with its second quarter 2017 results, resulting in an increase in projected output from 18.7 net MWs up to 25.9 MWs. And, in January 2017, the Company increased the capacity of its San Emidio reservoir from an estimate of 10 net MWs to an estimated generation capacity of up to 47 net MWs – more than the Company's current net output. According to regular Company analyst GlobalData, this increase in capacity gives U.S. Geothermal "a very cost competitive project."

97.    These recent operational achievements have translated into favorable financial results. According to the Company's August 10, 2017 press release announcing its second quarter 2017 financial and operating results, operating revenue for the first six months of 2017 was $14.75 million, compared to $14.17 million in the prior year period, and EBITDA for the first six months of 2017 was $6.23 million compared to $5.73 million for the prior year period. On a quarterly

basis, Operating Revenue for the quarter was $6.31 million, compared to $5.66 million for the prior year period, and EBITDA was $2.15 million for the quarter compared to $1.94 million for the prior year period. In commenting on these results, Defendant Glaspey suggested that there was more to come: "We believe the market for baseload renewable energy is gradually improving, as evidenced by our recent RFP proposal submittals."

98.    These favorable financial results are nothing new for the Company. For the year 2016, U.S. Geothermal reported net working capital of $23.07 million, as against net working capital of $10.08 million in 2015, reflecting an increase of 128.7%. The increase in net working capital was due to increase in current assets, which grew 57.4% to $29.58 million, from $18.79 million in the previous year while its current liabilities declined 25.2% to $6.51 million from $8.71 million.

99.    Finally, and, most telling, at least two superior offers existed when the Merger Agreement was executed, but were repeatedly ignored or rejected. As noted above, at the time that the Board executed the Merger Agreement, Party D's October 20, 2017 bid of $5.60 per share with potential triggering events to increase the price to $6.25 per share remained outstanding, ████████████████████ ████████████████

100.  In sum, the Merger Consideration inadequately compensated U.S. Geothermal stockholders for their shares.

## VI.    The Stockholder Vote Was Not Fully Informed

101.   Directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks stockholder action. The Board breached this duty by causing a materially incomplete and misleading Proxy to be filed with the SEC on March 20, 2018. As discussed below, the Proxy omitted material information that prevented U.S. Geothermal stockholders from casting an informed vote with respect to the Buyout.

102.   *First*, the Proxy is entirely silent with respect to the timing and nature of Defendant Pappas' approval and election to the Board and the potential conflicts he faced as an activist investor, including his apparent need and/or desire for liquidity or his preference for a buyer (Ormat) that could satisfy that need quickly, thereby creating a material misrepresentation that there was no conflict of interest between Defendant Pappas and U.S Geothermal stockholders. Defendant Pappas, as an activist investor, began accumulating shares of U.S. Geothermal during the first sales process with Ormat in 2015-2016. By the time that sales process ended, and the Board determined that continuing as a standalone company was in the best interests of stockholders, Defendant Pappas had amassed an illiquid 6% block of the Company's common stock. Since he couldn't sell his shares on the open market without taking a substantial haircut, Defendant Pappas decided to buy even

more shares and – perhaps more important at this juncture – influence with the Board.

103.   Leading up to the annual stockholder meeting and director elections, Defendant Pappas had purchased over 15% of the Company's outstanding shares. He then wielded the corresponding voting power of those shares to convince the Board to recommend him to stockholders as a director. On September 30, 2017, Defendant Pappas, at the Board's recommendation, was elected to the Board. On December 1, 2017, he was appointed to the Special Committee, and the rest is history. *Supra* ¶¶35-81.

104.   The failure to disclose a director conflict, or even a full factual record so stockholders could discern the conflict, is a breach of fiduciary duty. Given Defendant Pappas' placement on the Special Committee and Executive Committee and the prominent role he played in negotiating the Buyout, it is unquestionable that a stockholder would find information regarding his motives and conflicts material.



 such that the vote on

the Buyout was not fully informed.[24]

* * *

107.   In sum, the Board conducted a flawed sales process that failed to maximize stockholder value and caused a materially incomplete and misleading Proxy to be filed with the SEC. The Board prevented Plaintiff and the Class from being adequately compensated for their U.S. Geothermal shares, and deprived the Company's stockholders of the ability to cast an adequately informed vote with respect to the Buyout. Accordingly, Plaintiff seeks monetary damages.

_____

[24]   Attached hereto as Appendix 2 is a copy of this Amended Complaint in which the non-public information that was withheld from U.S. Geothermal's stockholders is highlighted (to the best of Plaintiff's ability) in grey, for the Court's ease in discerning what it is and what was withheld from U.S. Geothermal's public shareholders, which resulted in an uninformed vote.

## CAUSE OF ACTION

### (Against the Defendants for Breach of Fiduciary Duties)

108.   Plaintiff repeats and realleges each allegation set forth herein.

109.   The Defendants have violated fiduciary duties owed to the public stockholders of U.S. Geothermal.

110.   By the acts, transactions, and courses of conduct alleged herein, the Defendants have failed to obtain for the public stockholders of U.S. Geothermal the highest value available for U.S. Geothermal in the marketplace.

111.   As alleged herein, the Defendants initiated a process to sell U.S. Geothermal that undervalued the Company and vested them with benefits that were not shared equally by U.S. Geothermal's public stockholders. In addition, by agreeing to the Buyout, the Defendants capped the price of U.S. Geothermal stock at a price that did not adequately reflect the Company's true value. Moreover, Defendants failed to sufficiently inform themselves of U.S. Geothermal's value, or disregarded the true value of the Company, in an effort to benefit themselves. Furthermore, any alternate acquirer was faced with engaging in discussions with a management team and Board that was committed to the Buyout.   Finally, Defendants have to provide U.S. Geothermal's public stockholders with all material information necessary to decide whether to vote their shares in connection with the Buyout.

112.   As a result of the actions of Defendants, Plaintiff and the Class have suffered damages in that they did not receive the highest available value for their equity interest in U.S. Geothermal, and they also suffered the injury of an uninformed stockholder vote. Plaintiff therefore seeks damages on behalf of himself and the Class, in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands relief in his favor and in favor of the Class and against Defendants, as follows:

A.    Declaring that this action is properly maintainable as a Class action and certifying Plaintiff as the Class representative and his counsel as Class counsel;

B.    Directing the Defendants to account to Plaintiff and the Class for all damages suffered as a result of the wrongdoing, including pre and post-judgment interest;

C.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

D.    Granting such other and further equitable relief as this Court may deem just and proper.

Dated: June 1, 2018

**OF COUNSEL**

**KAHN SWICK & FOTI, LLC**
Michael J. Palestina
Christopher Tillotson
206 Covington Street
Madisonville, LA 70447
Tel.: (504) 455-1400
Fax: (504) 455-1498

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
Miles D. Schreiner
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel.: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com
mschreiner@monteverdelaw.com

**COOCH AND TAYLOR, P.A.**

*/s/ Blake A. Bennett*
Blake A. Bennett (#5133)
The Brandywine Building
1000 West Street, 10th Floor
Wilmington, DE  19801
(302) 984-3800
*Attorneys for Plaintiff*